## No. 12,434.

## FREDERICK W. STUCKE VS. ORLEANS RAILROAD COMPANY.

An invitation from the master or proprietor to come upon dangerous premises without apprising him of the danger is just as culpable, and an injury resulting from it is just as deserving of compensation in the case of a servant as in any other.

Stucke vs. Railroad Co.

A man can not be understood as contracting to take upon himself risks which he neither knows nor suspects, nor has reason to look for; and it would be more reasonable to imply a contract on the part of the master, not to invite the servant into unknown dangers, than one on the part of the servant to run the risk of them.

Whether invited upon the premises by the contract of service or by the calls of business, or by direct request, is immaterial; the party extending the invitation owes a duty to the party accepting it to see that at least ordinary care and prudence are exercised to protect him against dangers not within his knowledge and not open to observation.

The servant assumes the risk of such hazards as are apparently incidental to an employment intelligently undertaken, and those only.

A superior is presumed to know whatever may endanger the person or life of an employee, in the discharge of the duties of his employment, and is bound to specially warn him of the nature of the danger, unless said employee well knew of the existence and extent of the hazard or risk, or willingly exposed himself to it.

If the negligence of the master caused or contributed to the injury of his servant, the former is liable to the latter, notwithstanding the negligence of a fellow-servant likewise contributed thereto.

When an injury is caused partly by the negligence of a fellow-servant and partly by the failure of the master to provide the servant a reasonably safe place at which to work, the negligence of the fellow-servant will not exonerate the master,

When the service to be rendered requires for its performance the employment of several persons, there is necessarily incident to the service of each the risk that the others may fail in the exercise of the caution that is essential to their mutual safety.

Consequently, there is implied in the contract of service in such case that each servant takes upon himself the risk arising from the negligence of the other, while in the common employment; always *provided* that the master is not negligent in the selection or retention of the fellow-servant of either, or in providing him a reasonably safe and suitable place at which to work, and reasonably suitable tools and materials with which to work.

It is necessary in order to constitute a fellow-servant within this rule of jurisprudence, that the servants should be fellow-laborers in the same work, or the same department of a common employment.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*T. M. Gill* for Plaintiff, Appellee.

*Chretien & Suthon* (*Denègre, Blair & Denègre,* of Counsel) for Defendant, Appellant.

Argued and submitted May 14, 1897.

Opinion handed down January 24, 1898.

Judgment of this court amended and[rehearing refused March 21, 1898.

The opinion of the court was delivered by

WATKINS, J.   This is an action in damages, the plaintiff claiming twenty thousand dollars for the injuries he suffered; and the defendant has appealed from a judgment which was rendered against it, predicated upon the verdict of a jury for seventeen thousand dollars.

The petition makes this relation of the state of facts upon which he bases his claim, viz.:

That he was an employee of the defendant as conductor of one of its cars on the St. Peter street line in the city of New Orleans, on or about the 18th of May, 1896, when he was sent forward, by the orders of the company, with directions to repair the brake of car number seventeen (17), which was on the track over the pit in the barn, or station of the company, awaiting repairs.

That at about the hour of 10:10 A. M. of the day aforesaid car number (8) of defendant's French Market line came in upon the pit track—the switch regulating the use of said line of cars having been carelessly left open—and ran off the pit track aforesaid, there being no post, block, or any obstacle placed thereupon to check or control its velocity, or to change its course.   That said car number eight (8) thus very suddenly and unexpectedly ran into car number seventeen (17) aforesaid, and caused it to run over him, he being at the time, necessarily under the same, in the pit, and actually engaged in making repairs upon the brake of car number seventeen (17) aforesaid; and that said car number eight (8) aforesaid, in thus running car No. 17 over him, cut off his left leg just below the knee, greatly shocking him physically and mentally.

He avers that, on account of his being thus run over and injured, he suffered great pain and was sent to the hospital for treatment, where he was confined for a period of five months.

That, at the time of said casualty, he was about twenty-two years of age, and physically strong and healthy; and that he had, at the time, no other means of support for himself and family than his earnings, which were one dollar and thirty ($1.30) cents per day, with an expectancy of an increase thereof to fifty dollars ($50) per month.

He alleges that he was guilty of no fault or contributory negligence in causing, or in procuring said injury; but, on the contrary, same was solely due to the fault, carelessness and gross negligence, and want of skill and due care on the part of the defendant, its agents, employees and operatives, over whom it had and exercised exclusive care and control.

He alleges further that the pit track whereat he was engaged in repairing the brake on car No. 17 was within less than thirty feet of said switch, and that same had not been located or constructed with that judgment and care which is required of a master; and that same should have been located at a greater distance therefrom, and entirely secured from all risk and danger.

He further avers that the curves of said pit track were placed in a bad locality, and were also defective in their construction.

That the aforesaid casualty was sudden and unexpected by him, he believing, as he had just reason to believe, that all due and proper care and precaution had been taken for his safety and protection; and that said company would not jeopardize his life or limbs.

He alleges that he did not know that the pit track had been left open, or that the switch had been so placed as to allow a car of the French Market line to run upon the pit track; and that he had not been warned of any danger from that source, nor had he been notified of any defect in the machinery or appliances of the company, notwithstanding same were well known to said company, its officers and employees.

Finally the plaintiff alleges the loss and deprivation of business on account of the loss of his limb in addition to his mental pain and physical sufferings.

The defendant's answer is a general denial, coupled with a charge of gross carelessness and negligence on the part of the defendant, contributing to his injury.

In a supplemental answer the company makes the charge that the accident complained of was due to the fault and negligence of the defendant and of his fellow-servants, to which it in no way contributed.

The defendant's counsel filed an extended application for a new trial in the court below, from which we make the following extracts as furnishing the principal grounds upon which they relied for relief at the hands of that court, to-wit:

1. That it was proved on the trial that the accident was not occasioned through any negligence on the part of the company or its failure to provide necessary and safe apparatus, appliances and machinery.

2. That it was established beyond any question or doubt that the injury which befell the defendant was due "to the gross negligence of one of his co-laborers or fellow-servants, and that if the rules and regulations (of the company) had been carried out by the said fellow-servants the accident would not and could not have occurred, because the appliances furnished were such as experience had demonstrated to be the best, and afforded ample and perfect protection to the defendant."

3. That it was shown by incontrovertible evidence "that the switch which protected the pit track had been opened by Villa and Stucke, acting respectively as motorman and conductor of car No. 16; and that same, not having been closed after them, the accident occurred through their gross negligence or that of their fellow-servant"—said switch having been left open negligently and imprudently.

The foregoing facts being stated, counsel alleges the exoneration of the company upon the following grounds, viz.:

1. "That the employer can only be held responsible for his negligence and failure to provide safe apparatus or appliances to his servant;" and that the evidence indubitably shows that the apparatus and appliances which the company furnished to its employees were of the best and safest, and such as gave to them absolute protection against all danger.

2. That it is the established and uniform jurisprudence of the Supreme Court and of this court "that the employer is not responsible for the injury of a servant when the injury is the result of his own negligence or that of his fellow-servants."

The admissions which are contained in the foregoing motion have so narrowed and restricted the issue that we need only examine the single question of the non-liability of the defendant on the ground that the accident was caused through the plaintiff's own fault and negligence, and that of his fellow-servants—if it indeed be true that the company did furnish its servants with safe, suitable and appropriate apparatus, machinery and appliances for the proper and safe discharge of the duties of their employment.

An attentive and careful examination of the evidence has satified us that the defendant furnished its servants with safe, suitable and appropriate apparatus, machinery and appliances for the proper, safe and efficient discharge of the duties that were assigned to them —the only exception being as to the tongue of the switch in the barn which was employed for the purpose of throwing cars from the French Market track on the pit track, or *vice versa*, being slightly worn, or constructed a little low for safe and convenient use.

But, as alleged in plaintiff's petition, it is shown by the evidence that this switch had been inadvertently left open and opportunity was afforded for the car of the French Market line to pass through, and come into collision with the car which was standing over the pit and inflict injury upon the plaintiff. We are of opinion that the accident was solely due to that particular circumstance, and consequently we need not look further into the condition of the switch in deciding as to the fault or liability of the company.

And in determining that fault and liability *vel non*, we are of opinion that the aforesaid judicial admission of the defendant puts its defence exclusively upon the ground that the negligent act of leaving the switch open was solely that of plaintiff's fellow-servants; and hence it is to that end we must examine and anal yzethe evidence.

We make the following extract from the brief of plaintiff's counsel, as fairly presenting their view of the circumstances under which the accident occurred, and the argument in support of the company's defence, viz. :

" On the eighteenth day of May, 1896, there being a vacancy in the pit work, Mr. Willoz, the assistant superintendent, having in charge that department, sent for Mr. Stucke and told him to go to the work in the emergency pit, to make the small repairs necessary upon the cars of the company. Mr. Villa was then acting as one of the pitmen, in conjunction with Mr. Stucke. Car No. 16 of the company needed some slight repairs, and Mr. Villa and Mr. Stucke, both pitmen, went in the barn of the company, and together took hold of car No. 16, which was then in the barn, for the purpose of bringing it upon the emergency pit, to be there repaired and put in immediate service. Mr. Villa acted as motorman on said car, and Mr. Stucke as conductor. In order to take the car to the emergency pit, it was necessary to lead it, first. outside of the barn within a few feet of

12

the entrance, and to come back by the general track leading in that part of the barn where the emergency pit was. In order to get to the pit, or the dead track, it was necessary to pass three switches— first, one at the entrance of the barn; next, the one leading to what is known as the Bayou St. John track, and thirdly to the switch which divides the French Market track from the dead track, and which, when properly adjusted (as it was then), offers absolute pro- tection to the dead track.

" After going outside of the barn so as to get on the main track of the company leading into the barn, to reach the place of their destination, they had to open, first, the first switch, which they had closed so as to come out of the general barn where the cars are laid up over night, then to shut the switch between the French Market and the dead pit, or rather to put straight that switch in order to get on the dead pit. Tnis they did. But although it was their duty, under orders received by them and under the rules of the company, to replace those switches in the condition in which they had found them,.the French Market switch was left straight, that is, offering free passage to the cars coming into the barn to the emergency pit, the French Market track being (the switch having been left straight) closed to the cars. Car No. 16 was then placed by them on the emergency pit and on the dead track or pit track.

"The repairs having been made on car No. 16, it was moved ahead of the pit, and car No. 17 was ordered by Mr. Villa, one of the pitmen, to be put on the emergency pit for repairs. The crew of car No. 17 was then transferred by Mr. Villa to car No. 16, which had just been repaired, and said car left on its trip to Canal street.

" In the meantime, after car No. 17 had been placed on the emer- gency track and on the pit, the switch intended to protect this track, which had been put straight to allow car No. 17 to get on the track, was left in that condition, thus closing the French Market track, and opening to the cars coming in the barn the dead track or pit track.

"Shortly after Mr. Stucke had gone under the car to repair the shoe, car No. 8,which was destined for the French Market track, came into the barn on three or four notches, and instead of going on the French Market track, which was closed by the switch being made straight, went on the pit track, knocked against car No. 17, under which Mr. Stucke was working, pushing the car, which rolled over

his leg and broke it to such an extent that it had to be amputated a little above the ankle."

But it will be necessary to examine and consider some of the circumstances attending the accident, as well as some of the statements of the witnesses with regard to the manner in which it occurred, in connection with the foregoing summary of the evidence by the defendant's counsel, before we can arrive at a satisfactory conclusion in the premises.

One of the eye-witnesses of the accident states that the plaintiff was, on the 18th of May, 1896, engaged in repairing a car which was standing over the pit; and at the same time he saw another car come into the barn, the motorman on which was using the ratchet and brake, making a great deal of noise. That the plaintiff said to witness, "Listen how that fellow is using the ratchet"—the witness sitting about two feet distant from the plaintiff—and that he turned his head toward the incoming car, when, almost instantly, he heard the two cars bump together and heard the plaintiff halloa, "Like a miserable dog."

That he and his friends went up to him instantly and tried to pull him away from the car. That plaintiff tried to use his leg, but his foot was hanging down so he could not use it—his left leg having been mashed to a jelly—though he managed to get from under the car in some way or other. That he did not know how he did it, but saw him scramble out from between both wheels of the car; that he and his companions then pulled the plaintiff away—he being about six inches from the rail when they pulled him away.

He says that the plaintiff was at the time of the accident working on a brake and shoe, and was sitting immediately over the pit.

He states that the car came into the barn at such a high rate of speed that it jumped the switch that was about thirty feet from the car which plaintiff was repairing; and that the moving car came into collision with the stationary car that plaintiff was engaged in repairing. That this car should have taken the middle track, which is called the French Market track—that is, the track between the St. Peter street line and the pit track.

That there was no flag nor signal of any kind to indicate to an incoming car that the car which plaintiff was working on was in process of being repaired, and that there was neither post, block or barrier of any kind to prevent an incoming car from coming in on the

switch track and running into a car on the pit track while it was being repaired.

. But that after the happening of the accident to the plaintiff the defendant company caused a blacksmith to place pieces of iron across the track. He states further that if the switch had been thrown open to the left hand side the incoming car of the French Market line would have taken the proper track and not come into collision with the stationary car that plaintiff was working on; and that at the time of this accident there was no one attending to the switch.

That the pit spoken of is only for the purpose of making emergency repairs—for instance, when a brake is to be set or a new shoe put on —then the car is run over the pit, which is connected with the main line by the pit track and a system of curves and switches.

The rules of the company make it the duty of the motorman of an incoming car to attend to the switch, or to employ some one to attend to that duty for him.

The witness whose testimony we have related had been previously employed as a motorman and also a conductor, and was consequently familiar with the duties which are imposed upon those officers and the movement of the cars.

The person who was in company with the witness just adverted to makes quite a similar statement of the way in which the accident happened.

Another witness states that he was coming down stairs in the barn and heard the plaintiff halloa, and went down to where the accident happened and was present when he was removed from beneath the car. That the plaintiff was not tall enough to stand in the pit and make the repairs, and he was on that account compelled to sit down; and that a few minutes before the accident occurred he saw him sitting on the ground with his foot across the rail—he being at the time engaged in adjusting a brake or fixing a shoe.

Another witness testifies that he was present on the morning of the 18th of May, 1896, when the accident happened. His name is Frank Lasker, and his statement is that he " was working (with the plaintiff) on the car five or six minutes before the accident happened; and after the accident he was ordered to place an obstruction across the track " as a means of preventing a like occurrence. That he was directed to place them " between the switch and the pit."

That, in keeping with his said instructions, he placed a piece of railroad iron across the track and clamped it down on each side, and placed a weight, or tap, so that it could not be removed. That was done on the same day of the accident, and by the direction of the superintendent of the railroad company.

He further states that the plaintiff had been in the defendant's employ as a conductor, but was "laying off, taking a rest," when he (witness) was sent by Willoz, the foreman of the company, to go and get Stucke to go to work. That he thought maybe he was to take a car; but when he (reached) the station he was sent to work in the pit.

Then occurs the following interrogation and answers of the witness, to-wit:

" Q. Now, if you heard Mr. Willoz, the foreman of the Orleans Railroad Company, giving any instructions, or directions to Stucke, state what they were?

" A. He was to help me on the car, and we were to set to work tightening bolts, and working on the armature; and when we got through with our work I went off, and Stucke went to tightening the brakes, and to fitting the shoes.

" Q. Who did you say ordered Stucke to do that work?

" A. He got his orders from Mr. Willoz, the foreman.

" Q. Were you with Mr. Stucke then?

" A. Yes.

" Q. Were you with him when he was injured?

" A. No; but I was there after the accident happened.

" Q. When you left him, who did you leave with him—when he was repairing the brake?

" A. (He was) *alone.*"

The witness states that after the accident happened Mr. Willoz came back to the backsmith's shop and told him that Stucke had been " rolled over."

He states that the accident happened because the car of the French Market line passed through an open switch and ran into the stationary car on which Stucke was making said repairs.

John Villa, the witness to whose testimony the counsel of the defendant particularly refers in his motion for a new trial in the lower court, confirms the statement of the last mentioned witness to the effect that Stucke was pitman at the time of the accident, by the direction of the foreman, Willoz.

As the testimony of this witness is very much relied upon by the defendant's counsel, we make the following extracts from the record, viz.:

" Q. Were you intrusted with any authority to give any instructions, directions or orders?

" A. Only in part when Mr. Willoz was not there.

" Q. Did you or not give any instructions or orders to Mr. Stucke on that occasion?

" A. Yes, I did.

" Q. What were they?

" A. To fix the back shoe on car No. 17.

" Q. Where was that car at that time?

" A. It was over the pit—the emergency pit.

" Q. On what day did you give those instructions?

" A. I am not positive, but I think it was on the 18th of May, 1896.

" Q. Who clothed you with authority, in case Mr. Willoz was absent, to give such instructions?

" A. Himself.

" Q. Mr. Willoz?

" A. Yes.

" Q. What is his position?

" A. He is assistant superintendent of the road."

Upon the cross-examination of that witness, the following occurred, viz.:

" Q. How did car No. 17 come to go on the pit; who ordered it there?

" I ordered the car there?

" Q. That was on the 18th of May?

" A. Yes.

" Q. Was Mr. Stucke working on the pit before the 18th of May?

" A. Not that I know of.

" Q. Was he with you on that day, the 18th of May?

" A. Yes.

" Q. Was he then working with you as pitman?

" A. Yes.

" Q. Had he worked on any other car, on that day?

" A. Yes; on car No. 16.

" Q. Who brought car No. 16 on the pit?

" A. I did.

" Q. Were you alone in bringing car No. 16 on the pit?

" A. I disremember who was with me at the time.

" Q. Do you know where Mr. Stucke was at the time, when car No. 16 was brought on the pit?

" A. I think he was standing by the toolroom.

" Q. Car No. 16 was ahead of car No. 17?

" A. Yes."

The witness states that in moving car No. 16 from the shed to the pit he acted as the motorman, but does not remember who acted as the conductor.

" Q. Was Mr. Stucke there then?

" A. He was standing by the toolroom *when I pulled car No. 16 out.* (Our italics.)

" Q. How far is the toolroom from the pit?

" A. I disremember how many feet.

" Q. About how many feet?

" A. About sixty feet.

\*  \*  \*  \*  \*  \*  \*  \*

" Q. When you took car No. 16 on the pit, was the pit track closed or open?

" A. It was closed."

On that account the witness states that " he had to turn the switch to bring car No. 16 on the pit track;" and that after placing it on the pit track it was *his* duty to have placed the switch back in the same condition it was in, but he is not positive that he did so—that *he was of the impression that he inadvertently left it open.*

He says that after he had completed the repairs on car No. 16 he " turned it out to put car No. 17 in its place;" and " when car No. 17 came in on the pit track  \*  \*  \*  the crew of that car (No. 17) took car No. 16 off the pit track."

" Q. Who ordered *them* (the crew of car No. 17) to take car No. 16 off the pit track?

"A. I did.

" Q. Then as soon as they arrived on the pit track they went on car No. 16?

"A. Yes.

" Q. And then went off on the road?

"A. Yes.

" Q. Who ordered car No. 17 on the pit?

"A. I did.

" Q. Where were you at the time?

"A. I was at the end of the shed.

" Q. Where was Stucke at that time?

"A. I disremember where he was.".

The witness states that he is not certain whether the switch was in the same condition when car No. 17 came in on the pit track as he had left it when car No. 16 passed in, or not.

Up to this point in the statement of the witness it is quite clear that the car No. 16 was moved from its stationary position in the shed a short distance from the pit by him, unaided by any one upon the pit track, and *that he carelessly left the switch upon.*

That after car No. 16 had been repaired it was removed from the pit track *by the crew of car No. 17,* which witness had ordered upon the pit track—that car having come into the company's barn from a trip on the road just at that time.

That this witness does not claim that Stucke had anything whatever to do with the movement of car No. 16 upon the pit track, but on the contrary disclaims it—and, consequently, was in no way responsible for the switch having been left open, if it was so.

But the further statement of the witness to the effect that he had ordered car No. 17 to come in from the street and take the place of car No. 16 on the pit track, and that it was operated by its own crew and without coming into collision with car No. 16, is full and complete proof that the plaintiff had no agency in their removal, nor in causing the accident which happened afterward by means of car No. 17 rolling over him, because of car No. 8 having passed through the open switch and come into collision therewith.

Upon this witness' statement up to this point the movement of car No. 16 had nothing to do with the accident. The accident was produced by car No. 17, which had taken the place of car No. 16. Car No. 17 was operated by its own crew, and when it arrived at the pit its crew was transferred to car No. 16, and *they* moved it off of the pit track and at once carried it out on the road and made a trip with it.

Without any further explanation the inference would seem to be clear that the motorman of car No. 17 had left the switch open, so

that car No. 8 passed through and came into collision with car No. 17—it then being stationary on the pit—and caused the accident.

But the following questions and answers occur just at this juncture, viz.:

" Q. You are sure that you opened the switch for car No. 17 to come into the pit track?

" A. Yes.

" Q. After opening the switch for car No. 17 to get on the pit track did you close it again?

" A. No, sir.

" Q. Was it not your duty under your orders to close it after you had brought the car on the pit track!

" A. Yes; it was my duty to close it.

" Q. In other words, it was your duty to put the switch back in the condition in which you found it?

" A. Yes."

Then follows a very noteworthy interrogation of the witness, and the tendency of whose answers is to constitute Stucke a fellow-servant of his in the management and operation of car No. 16 in its removal from the shed to the pit track—a position just the reverse of that he had previously assigned the plaintiff.

" Q. Have you ever made any statement previous to this trial to the effect that you were acting as a motorman and Stucke was acting as a conductor, when you took car No. 16 from the shed to the pit?

" A. I don't remember.

" Q. You don't remember having made a statement of that kind?

" A. I don't remember how it was.

" Q. Did you not make the statement that Stucke was acting as conductor and you were acting as foreman on car No. 16 when it was brought on the pit track?

" A. At one time I did.

" Q. What induced you to make that statement, if it was not true?

" A. I disremember.

" Q. At the time you made that statement did you know that Stucke was acting as conductor on car No. 16?

" A. I am not positive.

" Q. Why did you make that statement if you were not positive?

" A. I was not sure whether it was Stucke or not.

" Q. You made that statement because you were not sure it was Stucke?

" A. Yes.

" Q. If you were not sure, it seems to me that you would not have made the statement that he was conductor?

" A. I don't remember that.

" Q. In other words, you made the statement that Stucke was conductor of car No. 16 when you brought it on the pit. Now, is that statement true or false?

" A. It is true.

" Q. Then you admit that Stucke was conductor of car No. 16, and that you were the motorman on that car, when you brought it on the pit track?

" A. Yes.

" By the jury:

" Q. Who did you make that statement to, about Mr. Stucke being the conductor on car No. 16, when it was brought on the pit?

" A. I made it once to the lawyer of the company," etc.

He then supplemented his answer and said that it was a policeman who took his statement.

The plaintiff as a witness confirmed the statement made by the witness Frank Lasker to the effect that he came to his house for him at the request of Mr. Willoz; that accordingly he went to see Mr. Willoz who informed him that he wished him to go to work in the pit; and that he went to work in the pit at once—that being the 16th of May, 1896.

That the second day afterward, car No. 16 was on the pit—that being the 18th of May, 1896—at about 8 o'clock in the morning. That he was ordered to paint the bottom of the car No. 16, that Frank Lasker was helping him, and when he finished that job he went to the end of the barn and then into the lunch room and ate his lunch.

The witness says further:

" While I was eating my lunch, *they* took car No. 16 away from there. After I got through eating lunch, I came back and saw car No. 17 on the pit. Then I went to Mr. Willoz to ask him what was to be done, and he told me to go and repair the brakes. And he told Frank Lasker to do something else back in the shop. * * * Then I went to the pit and sat down and commenced to repair the brakes and put my leg underneath the car, the best way I could.

I was putting in a pin, and the first thing I heard  (was a bump) and my leg was off.   And before the second wheel struck me I managed to drag the leg out; and somebody, I don't know who they were, dragged me away.''

He states that he thought the position he had taken was perfectly safe; and had he taken a position in the pit, he might have lost his head or both of his arms, or been crushed to death, under the circumstances related.   That no officer of the company, or employee, gave him any notice or warning of the dangers or risk of that employment.   That he had no idea of running any such risk or hazard as his employment had imposed upon him; and had he been so advised he '' would not have run any chances.''   That at the time he was sent to the pit to work he was in the employ of the defendant as conductor of one of its cars of the St. Peter street line, but was at the time enjoying a vacation.

The witness states positively that at the time of the accident he knew nothing of the condition of the switches, and that he never knew of any rule or custom of the company which required a conductor to go back and adjust a switch after the car had passed through it.

The following occurred upon the cross-examination of the plaintiff, viz.:

'' Q. Who brought car No. 16 on the pit?

'' A. I don't know.

'' Q. You did not?

'' A. No.

'' Q. You had nothing to do with car No. 16 on that day?

'' A. Yes, I had.

'' Q. What did you have to do with car No. 16 on that day?

'' A. After car No. 16 was on the pit I painted the bottom and top and did some sand-papering.

'' Q. At the time when car No. 16 was put on the pit what were you doing?

'' A. I could not tell you.  *I never saw it put on the pit.   It was only when I came back that I saw it on the pit.*

'' Q. *You are certain that you did not act as conductor on car No. 16 when it was put on the pit track?*

'' A. *I am certain I did not.*

\*          \*          \*          \*          \*          \*          \*

" Q. Who brought car No. 17 on the pit?

" A. I could not tell you? "

The witness states emphatically and circumstantially that from the 16th to the 18th of May, 1896, he was working under the orders of Wilioz and Villa, and by their directions and under their control and management.

The following occurred during the cross-examination of the foreman, Willoz, viz. :

" Q. When Stucke was working in the pit who else was working there?

" A. In the pit?

" Q. Yes.

" A. Frank Lasker was with him.

" Q. Was Frank Lasker there all the time when Stucke was working at the pit?

" A. *  *  *  No; Lasker was working as blacksmith.

" Q. Was not John Villa there with Stucke at the time?

" A. John Villa was there as armature winder.

" Q. Was he working on the car as armature winder at the time when Stucke was working at the pit?

" A. Yes.

" Q. Now, don't you know that John Villa was working in the pit with Stucke?

" A. On that morning; no, sir, he was not.

" Q. You are sure of that?

" A. Yes.

" Q. Why are you sure of that?

" A. Because when I gave the order to those pitmen, it was soon in the morning.

" Q. Which pitmen do you refer to?

" A. Stucke and Lasker.

" Q. You gave Stucke this order again?

" A. I gave my order to John Villa.

" Q. You told John Villa what was to be done?

" A. Yes; I told him to have it done.

" Q. Who did he order to do that work?

" A. Lasker and Stucke."

Again:

" Q. Then Stucke's sole duty was to repair car No. 17, which was on the pit?

" A. He went to repair the car if he was given orders to do so.

" Q. Who gave him the orders?

" A. I am the only one to give orders.

" Q. You and Villa?

" A. No; I am the only one to give orders.

" Q. Then Stucke's sole duty under your instructions at that time was to repair that car?

" A. I did not give Stucke the order directly, I told Villa to have Stucke and Frank Lasker to do the work.

" Q. You told John Villa to have them do the work?

" A. Yes.

" Q. And then you left?

" A. Yes; then I left."

From the foregoing excerpts from the testimony the following facts appear to be established, viz.: That Willoz, the foreman of the defendant company, having in charge the repairs of its rolling stock, etc., had directed the plaintiff, who was in its employ as the conductor of one of its cars, to go into the pit and make some repairs on a car—the witness, Lasker, being directed to accompany him. That with that view, Lasker was sent to the plaintiff's house to summon him to come to the barn; and John Villa was ordered to see that Stucke and Lasker did the work according to directions. That they went to work on the 16th of May, 1896, and worked together in the emergency pit for two days thereafter.

That on the morning of the 18th of May, car No. 16 was moved from the shed near where it was standing, to the pit track, and carried to the pit; and while there, the plaintiff painted it, top and bottom.

That when this work had been completed, car No. 17 came up to the barn and was halted, and by the directions of John Villa, the motorman and conductor thereof were transferred to car No. 16, and they moved it onto the street; and thereupon car No. 17 took its place upon the pit track for the purpose of undergoing some repairs.

That Stucke was at once set to work making repairs upon one of the brakes, when, immediately, car No. 8 of the defendant's French Market line came into the barn and, passing through an open switch, entered upon the pit track and came into collision with car No. 17, causing the accident and resulting injury to the plaintiff.

An effort was made to show that Stucke knew, or must have known, of the danger of the situation and the risks of his employment; and that in accepting same he necessarily assumed the ordinary and reasonable consequences thereof. That having been employed by the defendant company as a conductor of one of its lines of cars, and as such having frequently had occasion to pass the switch in question and in the vicinity of the pit, he must have become sufficiently familiar with the situation to have put him on his guard as to the risk and danger of employment in the pit.

It is quite true that the plaintiff had been employed as a conductor on one of the cars of the defendant's St. Peter street line, and that, as such, he had frequently passed through the switch and saw the pit; but the proof discloses the fact to be that he had never had occasion to critically observe either one or the other, as he had never done any work in the pit prior to his assignment thereto in May, 1896, and had never conducted a car onto the pit track at any time.

The statement of the plaintiff, as a witness, is that during the time of his employment as conductor he had obtained a general knowledge of the situation; but he also states, and emphasizes the statement, that he derived therefrom no information whatever of the situation which brought about the accident. That, on the contrary, he thought the situation perfectly safe, and he had received no information to the contrary from any person or officer, or employee of the defendant company; and that had he known of the danger he was in while he was working in the pit he would have declined the employment altogether.

Our conclusion is clear to the effect that the plnintiff was wholly unaware of the danger he was in while he was at work in the pit; that he had been put to work there by the orders of the defendant's foreman, in an emergency, and upon the spur of the moment; that he had never worked in the pit of the defendant company previously; and that he had not been advised by any officer or employee of the company of the risks and dangers of the situation and employment.

On this statement the plaintiff must be exonerated from the charge of fault or neglect upon his part in accepting the employment to which he was assigned.

The further claim of the defendant is that, even should it appear from the evidence that the plaintiff was himself guilty of no fault or

neglect in the premises, which caused or contributed to the acci-debt, yet the company is not liable, and the plaintiff can not recover, because the proof discloses that same was caused or contributed to by the plaintiff's fellow-servant.

On this score the contention of defendant's counsel is, as stated in the extracts we have made from their brief *supra*, and it may be fairly summarized as follows, viz.:

That in effecting the removal of car No. 16 from the shed where it was standing to the emergency pit, John Villa acted as motorman and Stucke as conductor; and the switch having been left open after same had passed through, both are equally responsible for the consequences of that negligence. And that subsequently, when car No. 17 went on to the pit track and took the place of car No. 16, John Villa again left the same switch open, negligently, so that car No. 8 passed through and came into collision with No. 17, and caused the plaintiff's injury.

Therefore, the argument of defendant's counsel is that Villa's fault as acting motorman is attributable to Stucke as acting conductor—the two being fellow-servants *pro hac vice.*

Their further contention is that Villa and Stucke were engaged at work together in the pit at the time of the accident, and, consequently, the fault of Villa in having left the switch open was attributable to Stucke also on the ground that they were fellow-servants in the further sense that they were both engaged at work as pitmen at the time of the accident.

But, at the outstart, it must be observed that—conceding the facts to be in reality as they were assumed, but for the argument only—car No. 17 passed through the switch onto the pit track after car No. 16 had been repaired and moved out; consequently there was no causal connection whatever between the negligent act of Villa in not closing the switch behind car No. 16, and his alleged negligence in not closing it after car No. 17 had passed through. Car No. 8 did not come into collision with car No. 16; and hence any negligence of Villa in connection with car No. 16 has no pertinency to the accident or injury. The alleged prior fault of Villa as motorman neither caused or contributed to the accident caused by car No. 8. Taking the last proposition first, what is the state of the testimony with regard to Villa and Stucke being pitmen, and therefore fellow-servants? An examination of the record discloses that Stucke and Lasker were

working in the pit together, and that the duty had been assigned to them by the foreman and *vice* superintendent.　Both Stucke and Lasker testify to this fact; and it is admitted to be a fact by the foreman in his testimony as a witness.　And John Villa states, unqualifiedly, in his testimony that he was authorized and clothed with full power to give orders and instructions to employees of the defendant, when Willoz, foreman, was absent, and that in the exercise of that authority he gave instructions to Stucke and Lasker to go to work in the pit on the day of the accident. And Willoz, foreman, states as a witness that upon that occasion he gave orders to Stucke and Lasker, through Villa, to go into the pit to work on the day of the accident.

But notwithstanding the foregoing statement Villa affirms upon cross-examination that Stucke was engaged at work *with him* in the pit on the day of the accident; and this with full knowledge of the contrary evidence of Willoz, Stucke and Lasker.

Indeed, Willoz was pointedly asked the question whether it was a fact or not that Stucke and Villa were engaged at work together in the pit, and his answer was an emphatic negative, coupled with the affirmative declaration that Stucke and Lasker were the pitmen, and not Villa and Stucke.

We say with perfect confidence upon the faith of this testimony that Villa and Stucke were not engaged as pitmen on the day of the accident, and were not fellow-servants in that respect; and no fault or negligence is attributable to Lasker, who was the fellow-servant of Stucke—he having completed his job and been sent to the blacksmith's shop, and there assigned to duty at the time of the accident.

What is the state of the evidence with regard to Villa and Stucke having been associated as motorman and conductor on cars No. 16 and No. 17, and, therefore, fellow-servants and mutually responsible for Villa's fault in having left the switch open?

In his examination in chief Villa stated that he brought car No. 16 from the shed near by to the pit for repairs, and that Stucke was not on the car at the time, *but was standing at the toolroom about sixty feet away*.　That the switch being closed at the time, he had to turn it so as to admit car No. 16 to the pit track; and that, while it was his duty to have closed the switch after the car had passed through, he left it open inadvertently.　But, inasmuch as this part of his testimony had failed to connect the plaintiff with *his* negligent act of

leaving the switch open, counsel for the defendant, after having plied him with a great many questions, succeeded in eliciting from the witness (Villa) that Stucke was acting as conductor of car No. 16 at the time it was moved from the shed to the pit—same being diametrically opposed to his previous statement—thus placing upon him (Stucke) a share of the responsibility for the accident. But Stucke affirms the truthfulness of Villa's *first* statement and denies the *second*.

The testimony of the witness is equally as conflicting and equivocal in respect to his movement of car No. 17 as it was with regard to that of car No. 16. As a witness, he said that when the repairs on car No. 16 had been completed " he turned it out to put car No. 17 in its place, and when car No. 17 came into the pit *the crew of that car took car No. 16* off the pit track. That he himself ordered them to take car No. 16 off of the track."

Then the witness, appearing to have overlooked the fact that he had just stated that car No. 17 was brought into the pit by *its own crew*—that is to say, by its own conductor and motorman—*declares that he opened the switch for car No. 17 to pass into the pit* and again left it open, notwithstanding it was his duty to have closed it after the car had passed through.

Upon this evidence of the witness Villa, two questions suggest themselves, (1) why did he *volunteer* his services to open the switch for car No. 17 to pass through, knowing that it was being operated by a motorman whose duty it was to perform that service; (2) and why did he make the statement, that failing to close the switch *after* the passage of the car was his (Villa's) fault, *when he knew there was a conductor on the car whose duty he had sworn it to have been to close it?* There can be no other answer to these queries than that they were *required by the exigencies of the case; as without them there was no possible way of connecting the plaintiff with his own confessed negligence.* For it is evident that his having left the switch open after car No. 16 had passed through, was insufficient to put the blame upon him, as car No. 17, which inflicted the injury, passed through *subsequently.*

But this witness' testimony proves too much, in that it shows that in point of fact the switch was *closed after car No. 16 passed through;* otherwise Villa would have had no occasion to open it for car No. 17 to pass through; consequently the movement of car No. 16 had

13

no effect on the case. And, in another respect, it proves too little, as it fails to show that the plaintiff had anything to do with the movement of car No. 17.

Our conclusion is that the statements of Villa are too confusing and conflicting to rest an opinion upon, and without them the company's defence is altogether without support; and upon the other evidence the conclusion is irresistible to the effect that the accident and injury were exclusively attributable to the fault of the defendant's agents and employees, who were not the plaintiff's fellow-servants.

Plain as we conceive the proof in favor of the plaintiff to be, we are of opinion that a few of the principles of law applicable thereto may be appropriately cited.

The general proposition on which the claim of the plaintiff is grounded is, that the law requires the master or employer to provide for his servant, or employee, a safe place for the performance of the duties which devolve upon him in the course of his employment.

The Code declares, in express terms, that "masters and employers are answerable for the damage occasioned by their servants and overseers in the exercise of the functions in which they are employed." R. C. C. 2320.

A distinguished author has well said that the "invitation to come upon dangerous premises without apprising him of the danger is just as culpable, and an injury resulting from it is just as deserving of compensation in the case of a servant as in any other case.

" Moreover, no reason of public policy, and none to be deduced from the contract of the parties, can be suggested which would relieve the culpable master from responsibility.

" A man can not be understood as contracting to take upon himself risks which he neither knows nor suspects, nor has reason to look for; and it would be more reasonable to imply a contract on the part of the master not to invite the servant into unknown dangers than one on the part of the servant to run the risk of them.

" But the question of contract may be put entirely aside from the case, and the responsibility of the master may be planted on the same ground which would render him responsible if the relation had not existed.

"Whether invited upon his premises by the contract of service or

by the calls of business, or by direct request, is immaterial; the party extending the invitation owes a duty to the party accepting it to see that at least ordinary care and prudence are exercised to protect him against dangers not within his knowledge and not open to observation. It is a rule of justice and right which compels the master to respond for a failure to exercise that care and prudence." Cooley on Torts, Sec. 550.

To the same purport are the following reported cases, viz: Ryan vs. Fowler, 24 N. Y. 410; Strahlendorf vs. Rosenthal, 30 Wisconsin, 674; Perry vs. Marsh, 25 Alabama, 659; Walsh vs. Put. Valve Co., 110 Massachusetts, 23; Horner vs. Nicholson, 56 Mo. 22.

It was held in Wheeler vs. Wason Manufacturing Company, 135 Massachusetts, 294, that "the master must use ordinary diligence and care to provide a safe place for the servant to work in."

In Nason vs. West, 78 Maine, 253, it was held "that the master is liable if he knew or ought to have known of the dangerous condition of the place, and the servant did not and could not reasonably know of the danger thereof."

The same author, Judge Cooley, states the rule again in the following terms, viz.:

"Negligence does not consist in not putting one's buildings or machinery in the safest possible condition, or in not conducting one's business in the safest way; but there is negligence in not exercising ordinary care, that the buildings and machinery, such as they are, shall not cause injury, *and that the business as conducted shall not inflict damage upon those who themselves are guilty of no neglect of prudence.*" *Id.*, Sec. 551.

In Smith vs. Sellers, 40 An. 527, this court said: "That the servant assumes the risk only of such hazards as are apparently incidental to an employment intelligently undertaken;" and in stating the converse of that proposition we said, that if the servant "is aware that proper precautions have not been taken for his safety, and still continues in the service, notwithstanding the risk, he will be considered as having assumed the responsibility of his own security." Erslew vs. Railroad and Traction Company, 49 An. 36.

Again:

"An employer who is engaged in a hazardous enterprise can not be required to give to every laborer a positive guarantee against danger, and immunity against injury, which might be suffered from

*accidental* and *fortuitous* causes *over which he could exercise no control*, and of the likelihood of their occurrence he could have entertained no apprehension at the time the contract of employment was entered into, or previous to the happening of the accident occasioning the injury.''

The following adjudicated cases in other jurisdictions support the foregoing proposition, viz.: Leovy vs. Railroad Company, 139 Mass. 584; Sullivan vs. Manufacturing Co., 113 Mass. 396; Coombs vs. Cordage Company, 112 Mass. 572; Wood on Master and Servant, p. 809.

In our opinion the foregoing authorities when applied to the evidence fully demonstrate that, as between the master and the servant, the former was at fault; we must, therefore, consider what effect was produced upon their relations by the intervention of a fellow-servant, if there was one.

As a matter of fact, the proof shows that car No. 8 of the defendant's French Market line came into the barn from the street, passed through a switch that had been carelessly left open, and came into collision with car No. 17, which was standing over the pit, and caused the plaintiff's injury.

It shows that car No. 17 came in from the street previously and passed through the switch and onto the pit track for the purpose of having some repairs made, and that said car was operated by its own conductor and motorman.

Hence, the conclusion to be drawn from the evidence is that the switch was left open through the fault of the motorman, or conductor, of car No. 17, one or both; and to their fault and negligence the accident is wholly attributable.

And it is not claimed that the plaintiff was either motorman or conductor of car No. 17.

It is quite evident that the movement of car No. 16, which preceded car No. 17 on the pit track, had nothing to do with the accident, because the proof is positive that the switch was *closed* when car No. 17 came into the barn, and its motorman had to open it to permit it to pass through.

Taking these facts into consideration the conclusion is irresistible that neither Villa, Lasker nor Stucke had any agency in the matter of leaving the switch open for car No. 17 to pass onto the pit track.

It is equally evident that there was neither co-association or fellow-

service between the conductor and motorman who operated car No. 8 of the French Market line of cars and the plaintiff who was working, temporarily, in the emergency pit. Their service and employment sustained no possible relation to each other.

But conceding, for the argument merely, that the relations of fellow-service did exist between the plaintiff and Villa, the alleged acting conductor of car No. 16, or between him and the conductor and motorman of car No. 17, and yet the master is not absolved from liability to the plaintiff as his servant, as he was guilty of culpable negligence in that he placed him at work in the emergency pit upon the spur of the moment, without apprising him of the danger of the situation and the risk he would have to undertake in accepting that employment; and because of his failure to post any notice giving due warning to servants of the danger of the employment, and because of his failure to place in the rear of the cars coming over the pit any block or impediment of any kind to protect same from such a collision as the one which occasioned the plaintiff's injury.

For if the plaintiff had been a fellow-servant of either of said servants, that fellow-service would not relieve the defendant from the just consequences of its own fault and negligence, to which the plaintiff did not contribute. And more particularly is that proposition clear when, as in this case, the alleged fellow-servant, Villa, was authorized and empowered, in the absence of the superintendent, to give orders and instructions to others; and who did actually assign the plantiff to the particular duty in question by order of the superintendent, but in so doing failed to give him any information as to the character of the service which would be required of him, or of the risks and dangers incident to the employment. On this question we find the following authorities pertinent:

In Grand Trunk Railway Co. vs. Cummings, 106 U. S. 700, the court say " that if the negligence of the company contributed to, that is to say, had a share in producing the injury, the company was liable, even though the negligence of a fellow-servant of Cummings was contributory also. If the negligence of the company contributed to, it must necessarily have been an immediate cause of the accident, and it is no defence that another was likewise guilty of a wrong."

In Town vs. Railroad Co., 37 An. 630, this court said that " it is now settled upon the very highest authority that when the injury is

caused partly by the negligence of a fellow-servant and partly by the failure of the company to provide proper and suitable apparatus, the negligence of the co-servant will not exonerate the company from the consequences of its own fault.'' Citing Grand Trunk Railway Co. vs. Cummings, *supra,* and Ellis vs. Railway Co., 95 N. Y. 546.

In Myhan vs. Electric Light and Power Co., 41 An. 964, this court clearly defined the duty of the master to his servants, in regard to employing them in any dangerous enterprise, in the following emphatic language, viz.:

" At any rate it was the duty of the defendant company to have known of the dangerous character and condition of the electric wires. The knowledge which they ought to have had the law presumes, *juris et de jure,* they had. Even had the company's representatives sworn that they did not know of the same, such ignorance on their part would not have exonerated them.

" A superior is presumed to know, and in law knows, that which it is his duty to know—namely, whatever may endanger the person and life of his employee in the discharge of his duties.

" In such cases, the superior is bound to specially warn the employee of the nature of the danger, and will not be excused in case of injury, unless he prove that the employee well knew of the danger, and, notwithstanding, exposed himself willingly and deliberately to it.''

The purport of the doctrine therein announced is, that notwithstanding a servant is employed by a representative of a corporation to perform a dangerous service for the company, and without its actual knowledge, that the duty is imposed upon the representative to warn the employee of the hazard of the employment; and in case of the failure of the representative to give such warning and injury result to the servant, full knowledge of its representative's fault will be imputed to the company and it will be charged with full responsibility therefor.

In Carey vs. Sellers, 41 An. 500, a similar principle was announced.

In Laning vs. Railroad Company, 49 N. Y. 534, the proposition is very well put in these words, viz.:

" That some general agent, clothed with the power to make performance for the master, has not done his duty at all, or has not

done it well, neither shows a performance by the master nor excuses the master's non-performance.

" When it is done, and not till then, his duty is met or his contract is kept.

    *     *     *     *     *     *     *

" If a master's personal knowledge of defects be necessary to his liability, the more he neglects his business and abandons it to others, the less will he be liable."

The principle announced in that case was applied in Poirier vs. Carroll, 35 An. 699.

In Railway Co. vs. Ross, 112 U. S. 377, the governing rule in respect to a master's exoneration from liability to his servant on account of the negligence of a fellow-servant is thus stated, viz.:

" When the service to be rendered requires for its performance the employment of several persons, as in the movement of railroad trains, there is necessarily incident to the service of each the risk that the others may fail in the vigilance and caution essential to his safety.  And it has been held in numerous cases, both in this country and in England, that there is implied in his contract of service in such a case that he takes upon himself the risks arising from the *negligence of* his fellow-servants, while in the same employment, *provided always the master is not negligent in their selection or retention, or in furnishing adequate materials and means for the work;* and that If injuries then befall him from such negligence, the master is not liable."

But, in applying the foregoing principle, the court said:

"The doctrine assumes that the servant causing the injury is in the employment with the servant (who is) injured, that is that both are engaged in one common employment.

The question in all cases, therefore, is, what is essential to render the service in which different persons are engaged a common employment?

The court in their opinion quote with approval the following excerpt from the opinion of the Lord Chancellor, in Coal Company vs. Reid, 2 Macqueen, 266, viz.:

"It is necessary, however, in each particular case, to ascertain whether the servants are fellow-laborers in the same work, because, although a servant may be taken to have engaged to encounter all the risks, which are incident to the service which he undertakes, yet

he can not be expected to anticipate those which may happen to him on occasions foreign to his employment.

When servants, therefore, are engaged in different departments of duty, an injury committed by one servant upon another, by carelessness or negligence in the course of his peculiar work, is not within the exemption, and the master's liability attaches in that case in the same manner as if the injured party stood in no such relation to him."

The court also cites with approval the following extract from the Lord Chancellor, in McNaughton vs. Railroad Company, 19 Court Sessions, 271, viz.:

That the master's liability "might be sustained without conflicting with the English authorities, on the ground that the workmen in that case were engaged in totally different departments of work; the deceased being a joiner, or carpenter, who, at the time of the accident, was *engaged in repairing a railroad carriage,* and the persons by whose negligence his death was occasioned were the *engine driver and the person who arranged the switches.*"

From that statement, the facts would appear to have been almost identical with those of the instant case. And in the principal case, the court speaking through Mr. Justice Field, in summing up, said:

" To bring the case within the exemption there must be this most material qualification, that the two servants must be men in the same common employment and engaged in the same common work under that common employment."

Again:

" There is, in our judgment, a clear distinction to be made in the relation to their common principal between servants of a corporation exercising no *supervision* over others engaged with them in the same employment, and agents of the corporation clothed with the control and management of a distinct department in which their duty is entirely that of direction and superintendence.

" A conductor having the entire control and management of a railway train occupies a very different position from the brakeman, the porters and other subordinates employed. He is, in fact, and should be treated as the personal representative of the corporation, for whose negligence it is responsible to subordinate servants.

\*          \*          \*          \*          \*          \*          \*

" In no proper sense of the term is he a fellow-servant with the

foreman, the brakeman, the porters and the engineer.  The latter are fellow-servants in the running of the train under his dir·ction; as to them and the train he stands in the place of and represents the corporation.''

In our opinion, that decision has peculiar applicability to the instant case for the reason that the proof shows that the plaintiff was assigned to duty in the emergency pit by the superintendent of the company, Willoz, and that, by his personal order, the plaintiff was summoned and assigned to that employment through the medium of Villa, as his agent and *vice* principal, representing the corporation.

In Towns vs. Railroad Company, 37 An. 630, this court recognized the principle announced in the *Ross* case, and observed that the doctrine of common employment of several servants being necessary to the master's exoneration from liability " has not had extensive application in this State, but it has nevertheless been recognized." Hugh vs. Railroad.

And then the court announced its opinion as follows, viz.:

" There is a tendency in modern jurisprudence and legislation to limit the extreme operation which has been given to it by the courts of this country and of England.

\*       \*       \*       \*       \*       \*       \*       \*

" And here the Supreme Court of the United States has, in a very recent decision, placed a very important limitation upon it, by holding that the conductor of a train and the employees do not bear the relation of fellow-servants to (each other), and that the company is responsible to them for injuries resulting from his neglect of duty." Railroad Company vs. Ross, 112 U. S. 377.

In Railroad Company vs. Baugh, 149 U. S. 368, the court through Mr. Justice Brewer held that an engineer and a fireman of a locomotive engine, running alone without any train attached, are fellow-servants of the company, so as to preclude the latter from recovering from the company for injuries caused by the negligence of the former; but in so doing the court distinguished that case from the *Ross* case, and affirmed the latter, and in the course of their opinion said:

" The inquiry must always be directed to the real powers and duties of the officials, and not merely to the name given to the office. The regulations of the company can not make the conductor a fel-

low-servant with the subordinates, and thus override the law announced in the *Ross* case."

The opinion in that case takes a very wide range, and states the principles, as recognized in that court, with reference to a master's duty and liability to his servant, as well as the principles upon which his exoneration from liability on account of the negligence of a fellow-servant depends, with so much care, and with such consummate ability, that, in our view, we can not close this opinion without quoting them *in extenso*, as they are not only the most recent expressions of that court, but bear upon the issues to be decided in this case with especial force and pertinency.

"A master," say the court, "employing a servant impliedly engages with him that the place in which he is to work, and the tools and machinery with which he is to work, or by which he is to be surrounded, shall be reasonably safe. It is the master who is to provide the place and the tools and the machinery; and when he employs one to enter into his service he impliedly says to him that there is no other danger in the place, the tools and the machinery than such as is obvious and necessary.

\*      \*      \*      \*      \*      \*      \*

"That positive duty does not go to the extent of a guarantee of safety, but it does require that reasonable precautions be taken to secure safety; and it matters not to the employee by whom that safety is secured, or the reasonable precautions therefor are taken.

"He has a right to look to the master for the discharge of that duty, and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of the obligation to the employee, or the latter's right to insist that reasonable precaution shall be taken to secure safety in those respects.

"Therefore, it will be seen that the question turns rather on the character of the *act* than the *relations* of the employees to each other. If the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the *act* is the negligence of the master," etc.

Not only do the foregoing decisions show that the master is not relieved from liability to the servant is case an injury is inflicted upon him through the fault or negligence of another servant, unless both of them were engaged in a common employment, and, therefore, fellow-servants; but that he is not relieved therefrom if the fellow-

servant, who is engaged in a common employment with the servant who is injured, is entrusted with the additional duty of seeing to it that the injured servant is provided with a reasonably suitable place to work in, and reasonably safe and suitable tools to work with—as in such case the fellow-servant becomes a *vice* principal *pro hac vice.*

And upon this last proposition Justice Brewer, speaking for the court, approvingly quotes the following extract from the opinion of the court in Railroad Company vs. Moore, 29 Kansas, 632, viz.:

" A master assumes the duty toward his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work, with reasonably safe machinery, tools and implements to work with, with reasonably safe material to work upon, and with suitable and competent fellow-servants to work with him; and when the master has properly discharged these duties, then at common law the servant assumes all the risks and hazards incident to or attendant upon the exercise of the particular employment, or the performance of the particular work, including the risks and hazards resulting from the possible negligence and carelessness of his fellow-servants and co-employees.

" And at common law, whenever the master delegates to *any officer, servant, agent or employee, high or low, the performance of any of the duties above mentioned, which really devolve upon the master himself, then such officer, servant, agent or employee stands in the place of the master, and becomes a substitute for the master, is liable for his acts or his negligence to the same extent as though the master himself had performed the acts, or was guilty of the negligence.*"

The foregoing statement of the provisions of the common law is very clear and unmistakable; and being applied to this case it fully demonstrates that, inasmuch as neither the defendant nor any one of his agents or servants is shown to have provided the plaintiff with a reasonably safe place at which to work, the condition upon which the latter is supposed to have legally assumed the risks and hazards incident to his employment had not arisen.

The learned Justice thus proceeds:

"It would be very easy to accumulate authorities on those propositions, for questions of this kind are constantly arising in the courts. It is enough, however, to refer to those in this court. In the case of Hough vs. Railway Company, 100 U. S. 213, and Northern Pacific Railroad Company vs. Herbert, 116 U. S. 642, this court recognized

the master's obligation to provide reasonably suitable place and machinery; and that a failure to discharge this duty exposed him to liability for injury caused thereby to the servant, and *that it is immaterial how or by whom the master discharged that duty.*

" The liability was not made to depend in any manner upon the *grade* of service of a co-employee, but upon the character of the *act* itself and a breach of positive obligation by the master," etc.

Having made a careful and extended examination of the authorities, State and Federal, English and American, we have reached the firm conclusion that the liability of the defendant is fully made out, and that the plaintiff is entitled to judgment; but we are of opinion that for the loss of a leg which was amputated below the knee, the amount awarded by the jury is excessive and must be reduced.

At the time of the accident, the plaintiff was about twenty-three years of age, and both strong and healthy. He had no other means of support than that afforded him as a conductor of an electric car, for which he was receiving about forty dollars per month, or four hundred and eighty dollars per annum. Placing his life expectancy at thirty years, he might he reasonably expected to earn about fifteen thousand dollars during that period of time.

But the loss of a leg will not deprive him of the means or ability of making something in the way of a subsistence for himself and family; but at the same time we must take into account the plaintiff's great physical pain and suffering as the result of his injuries.

Many precedents may be easily culled from our own reports, from which an intelligent estimate of the proper allowance may be made.

In Barksdull vs. Railroad Company, 23 An. 180, the court affirmed a verdict of fifteen thousand dollars for the loss of both of a child's legs.

In Choppin vs. Railroad Company, 17 An. 19, the court affirmed a verdict of twenty-five thousand dollars for the loss of one leg. In Ketchum vs. Railroad Co., 38 An. 777, the court affirmed a verdict of ten thousand dollars for the loss of an arm.

In Thompson vs. Railroad Company, 47 An. 1107, this court allowed twenty-five hundred dollars for the loss of an eye.

In Nelson vs. Railroad Company, 49 An. —, this court allowed twenty thousand for the loss of both legs. In Penniston vs. Railroad Company, 34 An. 777, the court affirmed a verdict of six thousand for a fractured leg.

In Railroad Company vs. Stout, 17 Wallace, 19, the Supreme Court affirmed a verdict of seven thousand five hundred dollars for the loss of one foot. In Railroad Company vs. Mares, 123 U. S. 710, the court affirmed a verdict of twenty thousand dollars for the loss of both legs. And in Railroad Company vs. Herbert, 116 U. S. 642, the court affirmed a verdict of twenty-five thousand dollars for the loss of one leg—a case possessing many of the features of this case, and the defence against which was the alleged exoneration of the master because of the negligence of complainant's fellow-servant.

In our opinion the award of the jury should be reduced to the sum of ten thousand dollars, with legal interest from judicial demand.

It is therefore ordered and decreed that the amount of the judgment appealed from be reduced to the sum of ten thousand dollars, and that, as thus amended, same be affirmed, with all costs of appeal taxed against the plaintiff and appellee, and those of the lower court to be taxed against the defendant and appellant.

MILLER, J., concurs in the decree.

## ON APPLICATION FOR REHEARING.

A re-examination of this cause has confirmed us in the correctness of our original conclusions in so far as the questions of law are concerned; but on a closer study of the facts and circumstances of the accident, and the character of the injury received-by the plaintiff, we incline to the opinion that the allowance of ten thousand dollars is excessive, and should be reduced to six thousand dollars.

It is therefore ordered and decreed that the amount awarded the plaintiff be reduced to six thousand dollars; and that as thus amended same be maintained, and the rehearing be refused.