No. 13,842.

Mrs. Belle Hill vs. Big Creek Lumber Company, Limited.

### Syllabus.

1. Whatever application the "fellow servant" doctrine may have under the law of Louisiana it cannot be given the effect of defeating recovery against the master for injury to a servant when it is shown that the mill, or that part of it where the casualty occurred, was, *from the standpoint of safety*, being run with an insufficient force.

2. A master must be held responsible, not only for the employment of competent persons to do his work, but also for failure to employ enough of them to do it *safely*, as respects others employed, at all times.

3. He must also be held responsible for such reasonably constant and steady supervision of his workmen that they will not be permitted to become grossly and criminally negligent. He is in a position to exercise that supervision; no other person is.

APPEAL from the Civil District Court, Parish of Orleans—*Ellis, J.*

*Scarborough & Carver* and *Solomon Wolff,* for Plaintiff, Appellant.

*Hudson, Potts & Bernstein (Boalner, Dodds & Boatner,* of Counsel), for Defendant, Appellee.

The opinion of the court was delivered by

BLANCHARD, J.   Plaintiff sues in the capacity of widow of George B. Hill, deceased, and as natural tutrix of her minor child Adolph B. Hill.

She claims $12,500.00 damages for and on account of the violent death of her husband in the saw-mill of defendant company, where he was employed.

Twenty-five hundred dollars of this sum she claims by reason of the physical and mental agony and pain suffered by the stricken man between the time of the casualty and his death.   With regard to this, the evidence shows Hill was instantly killed.   He did not live an appreciable length of time after being struck by the piece of lumber which caused his death.   Damages under this head may, therefore, be eliminated from the case.

The claim for the remainder of the amount sued for is predicated on the loss she has sustained of her husband and the child of its father.

The petition charges the cause of Hill's death to the unsafe and dangerous condition of the mill premises and of the machinery of the mill, especially pieces or parts of the machinery called "the edger" and "the conveyor," and that the condition of the premises and of the machinery was the result of the neglect of the defendant.

On behalf of defendant this is denied and it is asserted, *per contra,* that the mill, its machinery and equipment were in good order and condition, and that if there was any negligence in the operation of the machinery at the time of Hill's death, it was the negligence of a fellow servant, for which no liability attaches to defendant.

The case was tried before the judge—a jury not having been asked for.   *All* the evidence was taken under commission.   The trial judge did not have the advantage of seeing and hearing the witnesses.

There was judgment rejecting plaintiff's demand and she appeals.

*Ruling*—The contention of defendant is that Hill's death was due to the risks incident to the nature of his employment, and that these risks were well known to and understood by him.

Plaintiff's case as set forth in her petition is confined to narrow limits—negligence of the master in permitting the mill and its machinery to be and remain in an unsafe and dangerous condition.

Defendant's answer broadens its scope by reference to *the operation* of the machinery, and, in this connection, pleading the doctrine of negligence of a fellow servant.

The evidence admitted still further broadens its scope. Evidence received without objection makes pleadings, or rather supplies deficiencies in pleading.

The case, then, *to be judged is that which the evidence, in its full-* ness, discloses.

Defendant's mill is one of large capacity. It easily averages over one hundred thousand feet of lumber per day. It is a modern saw-mill, well equipped with improved machinery, and all the testimony negatives plaintiff's averment of the unsafe and dangerous condition of things in and about the mill, or any of its appliances, or appurtenances. There was no neglect of the master in this respect.

For sawing logs this mill operated both a large circular saw and a gang saw. The logs entered the mill from the east and their progress was westward through the mill, coming out on the west side in the form of finished product of lumber.

Looking in the direction towards which the logs were moving, the circular saw was on the left, the gang saw on the right.

What are called "live rollers" conveyed the lumber forward from the saws to what is called "the edger." The edger is a table about eight feet long by about six feet wide, through which projected seven smaller circular saws.

It was situated westward of the large circular saw and the gang saw, and midway between the two—that is to say, a line drawn from the center of the edger eastward would be equally distant from the circular saw and the gang saw in passing them. But the gang saw was nearer the edger.

The live rollers that were appurtenant to the gang saw conveyed the lumber sawed by it to the right side of the edger, those appurtenant to the circular saw conveyed the lumber sawed by it to the left of the edger.

The purpose of the edger was to further manipulate the lumber, now in the form of planks, and advance it towards the stage of the

finished product, which stage was not to be attained until it had gone through still other machines located westward from the edger.

The edger is a dangerous machine—perhaps the most dangerous to be found in and about a modern saw-mill.

Three of the small circular saws of the edger were on the right and manipulated the lumber that came from the gang saw. The other four saws were on the left and dealt with the lumber that came from the large circular saw.

The edger crew in front of that machine consisted of six men—three who fed lumber to the three circular saws located on the right side of the edger, and three who fed lumber to the four saws located on the left of that instrument.

Those on the left were John P. Cosman, Joe Cosman and George B. Hill, the deceased. Joe Cosman was not present when the accident occurred. He stepped aside for a few minutes. His absence has no bearing on the case.

Those working as feeders at the front of the edger could see only the upper half of the bodies of those working behind the edger.

Those working immediately behind the edger were William Willett and Oliver Cobb, and still further back, having charge of the transfer table and chain conveyor, was Adam Cosman.

As the lumber came from the edger it was received on live rollers and conducted to the transfer table and conveyor, the latter conveying it northward to the trimmer, which was a machine for its still further manipulation.

William Willett and Oliver Cobb (sometimes referred to in the evidence as *Alvin* Cobb) were called "the strippers." That is to say, their immediate duty was to catch the strips cut from the lumber by the edger, and adjust the lumber straight on the rollers that were moving it out of the way and towards the transfer table. Adam Cosman stood at the transfer table and it was his duty to keep the lumber moving on the transfer chains or conveyor from the transfer table to the trimmers, where it was received and fed to, or put through, the trimmers by two other men, to-wit, Jno. Bell and Jno. McClure.

It was also Adam Cosman's duty to look after and keep the transfer table and conveyor free from stray strips that might lead to the obstruction of those parts of the machinery of the mill.

If the live rollers back of the edger, or the transfer table back of the rollers, were permitted to clog by the lumber or strips failing to move or by not being properly adjusted and kept straight upon the same, imminent and great danger to those feeding the edger in front would result.

It was especially Adam Cosman's duty to see that there was no clogging of lumber upon the transfer table and conveyor.

About eleven o'clock of the day of the casualty Jno. P. Cosman and Hill, working in front of the edger, had fed to the latter a plank from the large circular saw. This plank was twenty feet long and two inches thick. It had gone through the edger except about two feet of the rear end of the plank. Hill had then, it seems, turned his face towards the large circular saw, presumably to receive another piece of lumber coming from that direction to be fed to the edger.

Just then the front end of the heavy plank, still in the edger and not yet through it, came in contact with a jam, a clog of lumber, upon the transfer table and conveyor. That stopped its progress, the plank turned a little and raised, the teeth of the small circular saws forming the edger, coming up through the table and revolving with incredible swiftness and power in the direction whence came the lumber, seized the plank and hurled it with great force back out of the edger towards its front, striking Hill about the waist and instantly crushing the life out of him.

So great was the force with which the plank was hurled back that the pressure rollers, which held the lumber down, coming in contact with it immediately back of the small circular saws on the edger, were raised and the plank shot back in spite of them.

There is some testimony to the effect that the rope controlling the lever, which operated the pressure roller on his side of the edger, was seized by Jno. P. Cosman at that moment and pulled, and that by this means the roller was raised permitting the saws to hurl the plank back, destroying Hill. But the preponderance of evidence is that Jno. P. Cosman did not raise the roller, which seems to have required considerable effort, though he did seize the rope as an aid in vaulting upon a platform to the left of the edger, in the endeavor, which he successfully made, to get out of the way of the plank.

He saw the trouble, instantly realized the danger, and sprang to a place of safety. But he swears he did not raise the pressure roller.

Hill, with his face turned back looking for another piece of lumber to feed to the edger, pursuing the line of his duty, did not see the danger, and while he may have heard the outcry which Jno. P. Cosman gave as he sprang, it was too late; the heavy plank was already upon him.

Adam Cosman, whose place was upon, or at the transfer table, as we have seen, to keep it and the conveyor clean, had left his post and gone off somewhere, and within a few minutes after his departure the clogging of the lumber took place, resulting in Hill's death as described.

We are asked to hold that Hill, thus done to death in the discharge of his duty, had assumed as a risk of his employment that the live rollers, the transfer table and conveyor back of the edger would be kept unobstructed, would not be permitted to clog with lumber. In other words, that he had assumed as a risk of his employment all the dangers incident to the operations and conduct of those stationed by the master at the rear of the edger.

We cannot do so.

The evidence shows that the three men, Willett, Cobb and Adam Cosman were needed, each of them, all the time in the work back of the edger; no one of them could safely be spared even for a few minutes from his post. Especially was this true of Adam Cosman. He was the *only* man at the transfer table. He worked behind Willett and Cobb. They were up nearer the edger, looking towards it, catching the strips coming rapidly from the edger and adjusting the lumber coming from it straight upon the live rollers leading to the transfer table.

Adam Cosman (or some man in his place when he stepped aside for any purpose) was needed *all the time* back at the transfer table to keep things straight and moving there. If he left, even for a very few minutes, danger to those feeding the edger immediately stalked forth.

The master knows this; it was his (the master's) duty to have an extra man in attendance, at a post so dangerous, to keep watch on the situation, and immediately step forward and take the place of either of the workmen, Willett, Cobb or Adam Cosman, who might step aside to answer a call of nature, or for any other purpose.

The master did not have such a man. The mill, therefore, or that

part of it, was, *from the standpoint of safety,* being run with an insufficient force.    This was negligence and the master's liability results.    Wood's Law of Master and Servant, Secs. 394, 3396.

Whatever application "the fellow servant's doctrine" may have under the law of Louisiana, it cannot have the effect, under the circumstances of this case, of defeating plaintiff's recovery.

A master must be held responsible not only for the employment of competent persons to do his work; but also for the failure to employ enough of them to do it safely, as respects others employed, at all times.    Bailey's Personal Injuries, Vol. 1, Secs. 982, *et seq.; Ib.* Sec. 1562.

He must also be held responsible for such reasonable constant and steady supervision of them that they will not be permitted to become grossly or criminally negligent.    He is in a position to exercise that supervision.    No other person is.    See Lacey vs. Oil Co., 31 S. W. 125.

Hill, working in front of the edger, had a right to assume that his safety would be adequately looked after in the operations going on behind the edger.    He had a right to assume he would be taken care of in respect to danger from that quarter.

Undoubtedly, it was gross if not criminal negligence in Adam Cosman vacating his post without warning and going off, thus permitting the lumber to clog and cause the accident.    But this negligence of a fellow servant, even from the standpoint of the advocates of that doctrine, cannot operate to discharge the master from liability where it appears, as here, that the negligence of the master caused or contributed to the injury and death of the servant.    This is the doctrine of the Stucke case, 50 La. Ann. 172, and it is supported by the text writers and the authorities generally.    See Towns vs. R. R. Co., 37 La. Ann. 630;    Bailey's Personal Injuries, p. 439, Sec. 982 *et seq.*s Maupin vs. Ry. Co., 99 Fed. Rep. 99.

It will not do for defendant corporation to argue it had enough men behind the edger to do the work there.    It was its duty to have had a sufficient number of men there not only to do the work, but to do it *with safety* to those working in front of the edger.

If Adam Cosman could not leave his post for five minutes without danger and death attending on his absence, the master should have provided against that contingency.    There should have been an extra man there for just such purpose.

Defendant's counsel, in their brief, claim there was an extra man employed to attend momentarily to the duties of an employee having occasion to absent himself for awhile. But this is error. There was no such extra man. One of the witnesses (Jno. P. Cosman) speaks of a "floor manager," but not in the sense of an extra hand. The floor manager is he in charge of the operations of that particular floor of the mill.

The same witness says it was "usual for the floor man to come and help when we are cutting long timber, but not when we are cutting short logs." The "floor man," then, was not an extra hand hired to fill temporary posts vacated by a laborer, doing work attendant with danger to others if left undone, stepping aside for a few minutes.

It is abundantly shown that if Adam Cosman had remained at his post, or any other man had been there to take his place when he left, the trouble would not have occurred. It is also shown that *all* the men employed were necessary to do the work—that is to say, each man had his hands full to do his own work, and no time to look after the duties of others who stepped aside, though it is said by some of the witnesses that when an employee stepped aside, it was the duty of those working with him to keep his work going.

The witness Coates, speaking of the work at the mill was asked:

"Q. Each man there at the mill has his position and it is required of him to stay there and discharge his duties?

"A. Yes, sir.

"Q. Do you keep any more laborers in that mill than is necessary to run it?

"A. Just the right number.

"Q. Does it not keep everybody busy to keep it running?

"A. Yes, sir.

"Q. If every man attends to his own business, if he goes to any one's work, his work will get behind?

"A. Yes, sir.

"Q. When everything is operating no man has any authority to leave his place to go and do anything else?

"A. No, sir; his duty is to be at his place, unless he is called away by some one."

Another witness, Jno. Bell, testified that the accident occurred because they (the mill owners) did not have a man to keep the

transfer table clear. He was off at the time. No suggestion that an extra man was employed to fill such temporary vacancies.

Indeed, all the witnesses testify that the accident was occasioned because of the clogging of the lumber on the transfer table, and that it clogged because of the fact there was no one at the time at the table to keep it clear.

W. A. Shields was foreman of defendant's mill and in charge of all the work done there. He testified for defendant. He speaks of "an extra man" working behind the edger, but on cross-examination, asked who this extra man was, said *he had heard it was Adam Cosman.*

Defendant's position, however, is that Adam Cosman was not an extra man, but regularly employed behind the edger, doing duty constantly there that day. The foreman, whose business it was to know, did not know this, and all he knew about an extra man was that he had heard Adam Cosman was such extra man.

The only conclusion to be reached from the evidence is there was no extra man on duty to take Cosman's place when he left, and that Willett and Cobb, who were working nearest him, were absorbed in their own duties which required them to look away from where Adam Cosman was stationed. It was not even shown they knew he was gone.

Adam Cosman, himself, was not put on the stand, nor did defendant account for his absence as a witness. He had been their employee and presumably was when the evidence was taken. He knew more about his own absence from his post that day, the reason for it, how long he had been gone, etc., than any one else. Yet he was not called to testify.

His two brothers were, as were others employed in that part of the mill the day of the accident. All the testimony relating to the accident, given in the case, is from men who were then and now employees of defendant. Necessarily, plaintiff had to go into the mill, itself, for witnesses.

For the reasons assigned it is ordered that the judgment appealed from be annulled, avoided and reversed, and it is now adjudged and decreed that plaintiff do have and recover of defendant the sum of five thousand dollars, with legal interest from judicial demand, together with costs of both courts.

Rehearing refused.